**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Frank Jarvis Atwood, | No.  CV 17-02682-PHX-JAT (JZB) |
| Plaintiff, | |
| v. | **ORDER** |
| M. Gay, et al., | |
| Defendants. | |

Plaintiff Frank Jarvis Atwood, who is currently confined in the Arizona State Prison Complex (ASPC)-Eyman, brought this civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 1.)  Pending before the Court are Plaintiff's Motion for Partial Summary Judgment Against Defendants Gay and Barker (Doc. 44); Defendants' Motion for Summary Judgment (Doc. 75); and Plaintiff's Objection to and Motion to Strike Defendants' Summary Judgment Reply (Doc. 85).[1]

The Court will deny Plaintiff's Motions and will grant in part and deny in part Defendants' Motion.

. . . .

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response to Defendants' Motion.  (Doc. 77.)

Plaintiff's recently filed Motion for Temporary Restraining Order and Preliminary Injunction to Ensure Provision of Medical Care Immediately (Doc. 86) will be addressed by separate order once briefing is complete.

# I. Background

Upon screening of Plaintiff's Complaint pursuant to 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Eighth Amendment medical care claims in Counts One through Four and ordered Defendants Gay, Barker, Babich, Johnson, and Corizon to respond to the Complaint. (Doc. 15.)

# II. Plaintiff's Objection to or Motion to Strike Defendants' Reply

Plaintiff moves to strike Defendants' Reply in support of their Motion for Summary Judgment on the basis that it contains "knowingly false material facts" and that Defendants are "maliciously seeking to mislead and deceive." (Doc. 85.) Plaintiff cites to 3 of Defendants' statements in which they assert that Plaintiff has not provided evidence to support his claims and that Plaintiff's pain and urinary issues have been consistently treated. Plaintiff then cites to evidence to dispute these statements. As such, Plaintiff's Motion is more properly characterized as a sur-reply, which is not permitted under the Court's local rules absent a motion for leave to file a sur-reply, which Plaintiff did not file.

The Court is mindful of the Ninth Circuit's instructions to construe motions liberally when filed by pro se prisoners and to avoid applying summary judgment rules strictly. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (courts must "construe liberally motions papers and pleadings filed by pro se inmates and . . . avoid applying summary judgment rules strictly"); *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988). Because Plaintiff's objections go to Defendants' interpretations of his medical records, when an asserted fact relies on a medical record, the Court will consider the medical record itself and not counsel's interpretation of the record.

Accordingly, Plaintiff's Objection to and Motion to Strike will be denied.

# III. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying

those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## IV.     Relevant Facts[2]

Since 1990, Plaintiff has suffered from numerous spinal diseases including degenerative disc and joint disease, herniated discs, scoliosis, stenosis, narrowed vertebrae,

_____

[2] The relevant facts are largely taken from Defendants' Statement of Facts (Doc. 76), the medical records submitted by the Parties, and their Declarations. While Plaintiff did file a Statement of Facts in support of his Motion, he did not cite to specific evidence in support of each fact, as required by federal and local rules of civil procedure. *See* Fed. R. Civ. P. 56; LRCiv 56.1 (requiring statements of fact and controverting statements of fact to cite to a specific portion of the record that supports the stated fact).

sciatica with radiculopathy, neuralgia, chronic pain, and partial paralysis. (Doc. 79-2 at 43 ¶ 2 (Pl. Decl.); *see also* Doc. 45 at 11, 15, 17, 28, 31, 35, 43, 51-52, 54, 60, 66, 92-93, 107.) Plaintiff has been in a wheelchair since September 2015. (Doc. 79-2 at 43 ¶ 3; Doc. 48 ¶ 3.) Treatment for Plaintiff's spinal degeneration and severe pain includes a TENS unit, lower back support, an ADA [Americans With Disabilities Act] shower, a permanent wheelchair, handicap ramps/bars, and medications. (Doc. 48 ¶ 6; *see, e.g.*, Doc. 45 at 35, 37, 39, 52, 54, 64, 72, 95, 102, 107, 109.) In 2007, Plaintiff was treated by an outside doctor for urinary voiding issues. (Doc. 45 at 74.)

On March 10, 2017, Plaintiff saw Defendant Gay, a Nurse Practitioner (NP), for a medication review; Plaintiff requested an increase in his Tramadol dosage for pain management. (Doc. 76 at 1 ¶ 1 and at 18.) Gay examined Plaintiff, noting that he was wheelchair bound, and that he showed mild tenderness to palpation in the lumbar and thoracic spine and the left sacroiliac joint extensor muscles. (*Id.*) He also exhibited mild muscle atrophy, weakness in the left arm and right knee, slightly decreased deep tendon reflexes in the left arm, mild tenderness to palpation in the left rhomboids, and no decreased range of motion in the hips and knees. (*Id.*) Gay diagnosed Plaintiff with unspecified viral hepatitis C without hepatic coma, radiculopathy in the lumbosacral region, and chronic neuropathic breakthrough pains at night due to spinal stenosis and radiculopathy. (*Id.*) Gay renewed Plaintiff's Tramadol prescription at the current dosage and prescribed a back support belt, knee sleeve, and TENS unit. (*Id.* at 19.)

On April 13, 2017, Plaintiff fell and injured his shoulder; he was taken to an outside emergency room and was prescribed medications and a sling. (Doc. 79-2 at 43 ¶ 7.)

In May 2017, Plaintiff experienced increasing pain, numbness, and immobility due to his spinal disease and submitted 6 Health Needs Requests (HNRs) regarding these issues. (Doc. 79 at 2 ¶ 6; Doc. 79-2 at 43 ¶ 8.) In a May 4, 2017 HNR, Plaintiff wrote that he needed a new Tramadol prescription and a renewal of Robaxin.[3] (Doc. 79 at 63.)

_____

[3] Tramadol is in a class of medications called opiate (narcotic) analgesics and is used to relieve moderate to moderately severe pain. U.S. Nat'l Inst. of Health, Medline

Plaintiff said the pain in his neck and back had increased, he had numbness in his hands and feet, and "jolts of numbness in both upper legs." (*Id*.) In a May 14, 2017 HNR, Plaintiff wrote that his Tramadol had not yet been renewed and he was experiencing "much pain, numbness and difficulty urinating." (*Id*. at 69.)

On May 17, 2017, Plaintiff saw RN Ortiz for his complaints of urinary retention. (Doc. 76 at 2 ¶ 2 and at 25.) Plaintiff told Ortiz that he needed to see the physician because he was having to put his finger in his rectum and press against his prostate to empty his bladder. (*Id*. at 25.) Ortiz observed Plaintiff insert a catheter and withdraw some cloudy urine and he was educated on the proper method of inserting a catheter and voiding into a urinal. (*Id*.) A urinalysis was performed and the results were given to Gay. (*Id*.) Gay gave Ortiz permission to give Plaintiff a 12-gauge catheter and a urinal. (*Id*.) Plaintiff was scheduled to see Gay the following Monday. (*Id*. at 26.)

On May 18, 2017, Plaintiff submitted an emergency grievance stating that he had still not seen a healthcare provider for his neck and back pain and numbness, which was getting worse, and that his pain medications had been "cut." (*Id*. at 48.) That same day, Plaintiff also filed an Inmate Informal Complaint Resolution, in which he stated that his "serious medical needs are being deliberately disregarded" and that he needs help "for spinal stenosis, scoliosis, degenerative disk disease, causing pain, can't urinate, stress/anxiety." (*Id*. at 53.) Plaintiff asked that his pain meds be renewed and that someone "arrange immediate HCP [healthcare provider] and specialist care" and he be awarded punitive/compensatory damages and other relief. (*Id*.)

On May 19, 2017, Plaintiff saw Gay for a medication review during which Plaintiff requested an increase in his Tramadol prescription. (*Id*. at 2 ¶ 3 and at 33.) At the time, Plaintiff was taking 50 mg of Tramadol in the morning, 50 mg at noon, and 100 mg in the evening. (*Id*. at 42 ¶ 8.) Plaintiff reported that he had neck discomfort and stiffness, but

---

Plus, *Tramadol*, *available at* https://medlineplus.gov/druginfo/meds/a695011.html (last visited Feb. 11, 2019). Robaxin (Methocarbamol) is a muscle relaxant that is also used to relieve pain. U.S. Nat'l Inst. of Health, Medline Plus, *Methocarbamol*, *available at* https://medlineplus.gov/druginfo/meds/a682579.html (last visited Feb. 11, 2019).

Gay later observed he rotated his neck without difficulty.  (*Id*. at 33.)  Gay discussed alternative drug therapy options and Plaintiff expressed concerns with Toradol, Amitriptyline, Tegretol, and Flexeril.  (*Id*.)  Upon examination of Plaintiff, Gay noted that Plaintiff was wheelchair bound, his lumbar and thoracic spine were tender to palpation, he could lean forward and back in his wheelchair without rigidity, and he was "neurologic grossly intact; reflexes on all extremity."  (*Id*.)  She also noted slight muscle atrophy in Plaintiff's lower extremities.  (*Id*.)  Gay diagnosed Plaintiff with chronic pain, myalgia, and retention of urine.  (*Id*.)  Gay decreased Plaintiff's Tramadol to one 50 mg tablet twice a day and added Zonisamide 50 mg.[4]  (*Id*. at 34.)  Gay states that she decreased Plaintiff's Tramadol prescription "as a result of the new rules concerning long term narcotic use, especially in prisoners."[5]  (*Id*. at 43 ¶ 11.)  Gay asserts that Plaintiff "had been on Tramadol for years and [she] wanted to use an alternative treatment plan for his pain management" and so she decreased his Tramadol from 3 to 2 doses a day and added "a new medication, a non-narcotic, to treat his pain."  (*Id*.)

Gay also addressed Plaintiff's complaint of an inability to urinate, which he said had developed 4 days earlier.  (*Id*. ¶ 8.)  Plaintiff states that Gay wanted a urine sample and refused to allow Plaintiff to return to his cell so that he could use his "process" to provide the sample, which consisted of heating water to soak tissue and applying the warmed tissue to the rectal opening.  (Doc. 79-2 at 44 ¶ 11.)  Plaintiff further asserts that Gay refused to wash the "filthy" catheter issued on May 17 or provide a new catheter and would not allow him to return to his housing unit until after he entered the inmate toilet and used the "infected catheter" to give the urine sample.  (*Id*.)  Gay denies that she locked Plaintiff in a bathroom and forced him to use a contaminated catheter.  (Doc. 76 at 44 ¶ 12.)  Plaintiff's

---

[4] Zonisamide is an anticonvulsant that it used in combination with other medications to treat certain types of seizures.  U.S. Nat'l Inst. of Health, Medline Plus, *Zonisamide*, *available at* https://medlineplus.gov/druginfo/meds/a603008.html (last visited Feb. 11, 2019).

[5] Gay does not explain anything about these new rules such as who issued them, what they said, or how they applied to Plaintiff.

urine dip was negative for nitrites, blood leukocytes, and bacteria, meaning there were no signs of infection, and so Gay sent out for a routine urine culture and test for PSA levels. (*Id*. at 42-43 ¶¶ 8-9.)

In a May 21, 2017 HNR, Plaintiff requested "urgent care" for "extreme pain in neck, shoulders, back, & legs" and Tramadol withdrawal due to Gay reducing his Tramadol from 200 mg to 100 mg daily and changing the time when the medication was administered so that he had nothing between 3:00 pm and 11:00 am the next day. (Doc. 79-1 at 1.) The response dated May 30, 2017 says Plaintiff was scheduled on the provider line. (*Id*.)

In a May 23, 2017 HNR, Plaintiff wrote he could not get up for breakfast or to use the toilet, he could not sleep, he was suffering from Tramadol withdrawal, and had "unbelievable neck & back pain." (*Id*. at 3.) Because of the pain, Plaintiff could not get up and defecated in his pants. (*Id*.) The response on the HNR says to "[p]lease send IM [inmate] letter to M. Johnson FHA." (*Id*.)

In a May 24, 2017 HNR addressed to Dr. Babich, Plaintiff wrote that pain was "precluding mobility" and that he had been denied TENS supplies and analgesic cream. (*Id*. at 5.) Plaintiff said that the decrease in Tramadol had led to "cluster headaches and severe liver pain, reinjury of shoulder, further hand/pelvic numbness, significant emotional turmoil, in addition to tremendous pain." (*Id*.) The response to the HNR says "[inmate] letter to FHA." (*Id*.)

On May 24, 2017, Defendant Facility Health Administrator (FHA) Johnson received Plaintiff's May 18, 2017 emergency grievance, which Johnson determined was not an emergency "in light of the fact that he had seen a provider regarding the issues the day after he wrote the grievance." (Doc. 76 at 4 ¶ 7 and at 47-48.)

In a May 27, 2017 HNR, Plaintiff wrote that he had been using the same catheter for a week and a half, that it burns when he urinates, his urine is cloudy and has a "horrible smell," that his right testicle is sensitive and hurts, and he suspects he might have a urinary tract infection (UTI) from reusing the catheter. (Doc. 79-1 at 10.) Plaintiff saw RN Ortiz that day, who examined Plaintiff, and referred Plaintiff to NP Gay "to reassess and evaluate

the lab results for the Urine culture which have not arrived yet. Give him a new sterile catheter to use until he sees her and changes are made." (*Id*. at 14.) A follow-up appointment with Gay was scheduled for May 31, 2017. (*Id*.)

On May 30, 2017, Plaintiff was found on the floor covered in vomit and urine; when he arrived at the Browning Health Unit, his fever was 102.3 and he was rushed by ambulance to the emergency room. (Doc. 79-2 at 44 ¶ 13; *see also* Doc. 76 at 59.) Once at the ER, Plaintiff was diagnosed with a UTI, prescribed an IV and antibiotics, and instructed to follow up with the prison healthcare provider the next day. (Doc. 79-2 at 44 ¶ 13.)

On May 31, 2017, Defendant Gay evaluated Plaintiff for a post-hospital follow-up at which he complained of chills, burning with a full catheter in place, and dark colored urine. (Doc. 76 at 61.) After examining Plaintiff, Gay assessed Plaintiff with secondary UTI and ordered that Plaintiff was to continue Bactrim DS; Gay also prescribed Phenergan 25 mg and an injection of Promethazine HCL for nausea and vomiting and advised Plaintiff to increase his fluid intake. (*Id*. at 4-5 ¶ 10 and at 62-63.) Gay's plan was for Plaintiff to return later that day to evaluate fluid intake status, to leave the catheter in place for 3 days and to follow-up on the nurse line for catheter removal. (*Id*. at 5 ¶ 10.) Plaintiff states that Gay "refused to provide the I/V" at this visit.[6] (Doc. 79-2 at 44 ¶ 15.)

On May 30, 2017, LPN Hawley responded to Plaintiff's Informal Complaint, noting that on May 19, 2017 Plaintiff was evaluated by the medical provider who determined that Plaintiff should continue Tramadol twice a day and added Zonisamide. (Doc. 76 at 54.) In a corrected response dated May 31, 2017, Hawley also addressed Plaintiff's concerns regarding his urinary retention, noting that a "routine dip was negative for nitrites, blood leuks, and bacteria. A urine sample was sent for culture and PSA level was ordered. You

---

[6] Plaintiff does not say what I/V Gay refused to provide. The May 30, 2017 hospital discharge instructions only state that Plaintiff had a prescription for Bactrim DS. (*See* Doc. 79-1 at 21.)

are scheduled for a follow up exam. . . . The Medical Provider has determined no medical necessity for you to be seen by an outside specialist at this time." (*Id.* at 68.)

On June 1, 2017, Plaintiff submitted an HNR stating that he is "still shivering (at times convulsively) feel feverish, very dehydrated (to drink over a sip of water causes vomiting[)], pain in back from shivers and bad h/a [headache, possibly]. Actually, feel am worsening." (Doc. 79-1 at 25.) After he filed this HNR, Plaintiff was discovered unconscious on the floor and was taken to the Health Unit and given an IV. (Doc. 79-2 at 44 ¶ 16.) The medical record from that date states "ICS for Patient found Down and unconscious in His Cell." (Doc. 79-1 at 27.) The plan of care was to "run IV Dextrose 5% with IM Promethazine 25 MG for nausea/vomiting and IV Push Toradol 30 MG" and to follow up with Gay in the morning. (*Id.* at 29.) Plaintiff saw Dr. Williams on June 2 and was given an IV; the Zonisamide was discontinued due to suicidal ideation. (Doc. 79-2 at 45 ¶ 17.)

On June 11, 2017, Plaintiff filed an Inmate Grievance stating that he suffered physical and mental trauma from taking Zonisamide and by the refusal to treat his hand and pelvic numbness caused by his spinal disease. (Doc. 76 at 72.) Plaintiff wrote that Zonisamide was contraindicated by his history of liver disease and mental illness and after Defendant Gay prescribed Zonisamide, he felt depressed and in pain. (*Id.*) Plaintiff said Gay never examined him, did not refer him "to ortho for evaluation," and his complaints of numbness were ignored. (*Id.* at 73.) Defendant Johnson responded to Plaintiff's Grievance on June 30, 2017, stating that when Plaintiff saw Dr. Williams on June 2, 2017

> an assessment was completed, medications reviewed and adjusted (Zonisamide) discontinued, diagnostics (labs) reviewed and reordered, education provided (rest, hydrate avoid sudden movements) and follow up scheduled. There is no request for off-site specialist. . . .
>
> In conclusion, you are encouraged to take all your medications as ordered by your medical provider however; I have sent a copy of your grievance to the medical director for review. Upon completion of the chart review, the medical director may

schedule a follow up appointment with a different provider if clinically indicated.

(*Id*. at 71.)

Plaintiff sent several HNRs in July 2017 for "more pain, numbness, and immobility." (Doc. 79-2 at 45 ¶ 18.) In a July 4, 2017 HNR, Plaintiff said he had "significant numbness in both hands and pelvic area plus increased trouble moving legs." (Doc. 79-1 at 38.) Plaintiff said his last orthopedic visit was in 1999 for his spinal disease and he asked to be provided with a specialist appointment. (*Id*.) Plaintiff was seen on the nurse line on July 5, 2017 and he requested orthopedic and urology visits for further treatment of his bladder and spinal disorders. (*Id*. at 40.) The nurse found Plaintiff alert and oriented and not in any overt physical distress. (*Id*. at 41.) The nurse noted Plaintiff was to have a follow-up appointment with Dr. Babich on July 13, 2017. (*Id*. at 42.)

In a July 16, 2017 HNR, Plaintiff complained that he had not seen the healthcare provider yet. (*Id*. at 44.) A note on the HNR indicates that a CNA was to reschedule the missed follow-up appointment from July 13, 2017. (*Id*.)

On July 22, 2017, Plaintiff's wife sent an email to Dr. Babich regarding her husband's medical care. (Doc. 76 at 6 ¶ 13.) Babich then contacted Defendant Johnson asking if he was permitted to respond to Mrs. Atwood. (*Id*. at 78.) Johnson responded that Mrs. Atwood's communication was improper and against policy and she would contact Mrs. Atwood and remind her of the policy. (*Id*.)

In a July 26, 2017 HNR, Plaintiff again complained that he had not yet seen the healthcare provider for his hand numbness, difficulty walking and urinating, that his 4 Special Needs Orders (SNOs) were expiring the next day, and that his walker was wobbling and caused him to fall and hit his head. (Doc. 79-1 at 49.) Plaintiff said he needed to see the healthcare provider immediately for orthopedic, physical therapy and urology referrals. (*Id*.) Plaintiff was seen on the nurse line on July 27, 2017. (*Id*. at 51-52.) The medical record from that encounter states "appointment needed provider/SNO renewal/offender request urology/ortho consult." (*Id*. at 52.) In a July 31, 2017 HNR, Plaintiff wrote that

he fell on July 29, badly reinjuring his shoulder, and the following day, when he was transferring from his bed to his wheelchair, he hit his head. (*Id*. at 54.)

Plaintiff states that on August 1, 2017, he was seated outside of the healthcare provider's office having his vitals taken when Defendant Dr. Barker began verbally abusing him. (Doc. 79-2 at 45 ¶ 19.) Plaintiff was removed from the health unit without being examined and Dr. Barker discontinued all pain medications and Plaintiff's wheelchair. (*Id*. ¶¶ 19-20.) Dr. Barker noted the following in Plaintiff's medical record:

> Patient alleges that he needs a wheelchair. He alleges that he is [in] chronic pain and needs narcotics. Patient has been on tramadol and muscle relaxant and had difficulty voiding with urinary retention requiring a catheter. His PSA was normal and urine culture was normal and [h]is medical panel on 3/17 was normal. He is a negative rheumatoid panel and no hepatitis. All tests are normal. He has had x-rays of his feet which only show minimal heel spurs and x-ray of his right hand only showed old healed fifth metacarpal fracture. He is on blood pressure medications. He[] is requesting to see an orthopedist and urologist without symptoms to justify a referral. He became hostile and aggressive and had to be forcefully removed since he refused to get out of his wheelchair. He has been documented by staff and by Dr. [sic] Gay's examination that he ambulates well and has no neurological deficit.[7] He no longer has a catheter and is able to []void.

(Doc. 79-1 at 56.)

Barker noted that "Patient refused examination becoming hostile aggressive. Blood pressure was normal with pressure 135/78 complete vital signs unable to be obtained because inmate had to be forcefully removed for security reasons by staff." (*Id*.) Under Assessment Notes, Dr. Barker wrote: "Based on direct observation of active physical activity exercising and examination was normal by Dr. Gay, patient has histor[y of] malingering and drug-seeking with complications urinary retention with tramadol. There is no justification found for narcotic pain medication or muscle relaxants. There is no

---

[7] It is not clear if Dr. Barker is referring to Defendant NP Gay as "Dr. Gay" or if Plaintiff actually saw a Dr. Gay in addition to NP Gay.

justification for a wheelchair." (*Id*. at 57.) Barker discontinued Plaintiff's wheelchair, Methocarbamol (Robaxin) and Tramadol, but he avers he prescribed Tramadol 50 mg for 5 days to taper Plaintiff off the drug. (*Id*. at 58; Doc. 76 at 89 ¶ 10.) In his Declaration, Barker repeated his assertions that Dr. Gay noted Plaintiff ambulated well and had a history of malingering and drug seeking but he does not cite to any medical records containing these observations. (*See* Doc. 76 at 88-89 ¶ 9.)

On August 3, 2017, Plaintiff submitted an emergency grievance stating that on August 1, while sitting outside the healthcare provider's office, Dr. Barker began berating him and insisting that Plaintiff "was a fake" and "could walk fine" and that Plaintiff was "full of shit" and had better "not pull any bullshit" with him. (Doc. 79-1 at 67.) Plaintiff tried to explain to Barker that he fell on July 30 while trying to use a walker, and Dr. Barker said Plaintiff was a "f—ing liar." (*Id*. at 68.) Plaintiff then tried to explain the problem he had urinating but was returned to his cell without an exam or even entering Dr. Barker's office. (*Id*.) Plaintiff learned that night that Dr. Barker had reduced his Tramadol by 60% and Robaxin by 67%. (*Id*.) Plaintiff wrote that he fell again on August 2 while trying to use a walker and injured his right shoulder. (*Id*.) Dr. Barker ordered x-rays when Plaintiff was in the health unit and then ordered that Plaintiff's wheelchair be removed. (*Id*.) Plaintiff's wheelchair was taken from him when he returned to his cell and he was forced to crawl from bed to the cell front for "food, meds, etc." (*Id*.)

On August 3, 2017, Plaintiff's wife sent an email to Defendants Johnson and Babich regarding Dr. Barker taking away her husband's wheelchair and medications. (Doc. 76 at 7 ¶ 16.) Johnson responded to Mrs. Atwood that she would follow up with all the parties and would call Mrs. Atwood that evening to discuss her "findings/plan." (*Id*. at 94.)

Plaintiff's wheelchair was returned to him on August 3 and he had a medical examination on August 4, 2017. (Doc. 79-2 at 45 ¶ 22.) Dr. Stewart examined Plaintiff at August 4 in his cell "to determine need for a wheelchair." (Doc. 79-1 at 73.) Dr. Stewart noted that Plaintiff has a history of cervical disc disease "known since his MRI 2014" and that Plaintiff continued to complain of pain. (*Id*. at 74.) Upon examination, Dr. Stewart

noted right upper extremity weakness with limited range of motion, no muscle atrophy, "weakness likely mechanical pain limitation," and decreased hand grip.  (*Id*.)  The left upper extremity was within normal limits.  (*Id*. at 73.)  The right lower extremity showed "significant weakness, sensory deficits noted as well fasciculations and hyperreflexia at the tibia."  (*Id*.)  The left lower extremity was "similar to right with weakness, sensory deficit and hyperreflexia."  (*Id*.)  In his assessment, Dr. Stewart noted bilateral lower extremity weakness and "previous history of cervical disc disease from 2014 MRI showing disc bulge causing thecal sac contact at C3 C4 C5 foraminal narrowing at all cervical levels and pinal canal stenosis at C4-C5 and C5-C6."  (*Id*. at 74.)  In the plan or care, Dr. Stewart wrote that Plaintiff "can continue in wheelchair" and will need a repeat MRI "to determine advance of previously found disease"; depending on the MRI findings, he would consider surgery versus physical or occupational therapy.  (*Id*. at 75.)

On August 4, 2017, Defendant FHA Johnson responded to Plaintiff's August 3 emergency grievance regarding the August 1 health service encounter with Dr. Barker:

> It is documented that during the above referenced encounter you refused examination[,] however[,] the provider documented as a result of direct observation of active physical activity there is no justification for a wheelchair and the wheelchair was discontinued.  I have requested site medical director complete follow up assessment secondary to the reported fall.  The follow up medical provider health service encounter was completed August 4, 2017; during the August 4, 2017 encounter an assessment was completed, request for MRI submitted and use of wheelchair permitted.

(Doc. 76 at 100.)

On August 8, 2017, Plaintiff submitted an HNR stating he was in severe pain and not receiving any medications for his back, neck and shoulder, even though his treatment has been "non-stop since 1980s, including Tramadol since 2013."  (Doc. 79-2 at 6.) Plaintiff asked to have his prescriptions restored for Tramadol and Robaxin 3 times daily.  (*Id*.)

On August 9, 2017, Plaintiff saw Dr. Barker, who noted that "patient claims he has to have a wheelchair and cannot walk. Examination by Dr. Gay on 5/17 indicated patient ambulating well with no neurological deficits reported. Staff report patient exercising well without use of wheelchair. Staff also reported inmate getting angry and jumping up out of his wheelchair and throwing his food" and "that he could ambulate well." (Doc. 79-2 at 8.) Barker wrote that "Inmate apparently will get a stay of execution if he is ill and in a wheelchair" and that Plaintiff "has become angry and aggressive on two previous occasions preventing examination by this examiner." (*Id*.) Barker wrote that Plaintiff "alleges cervical spine disorder and Dr. Stewart suggested a C4 through C6 level abnormality however there is no symptoms or physical findings to correlate with that abnormality," and "[h]is neurological examination is essentially normal." (*Id*. at 10.) Barker said "there is no justification for a wheelchair in this patient for chronic pain medications." (*Id*.) He noted that an x-ray of the lumbosacral spine did show "multilevel degenerative disc disease but no neurological deficit to correlate with any [illegible]." (*Id*.) Barker said that Plaintiff could continue to use the wheelchair until the result of the MRI of the cervical spine is available "even though the neurological examination does not show limitation." (*Id*.) Barker assessed Plaintiff with "pain disorder exclusively related to psychological factors," "other cervical disc degeneration, unspecified cervical region," and "other intervertebral disc degeneration, lumbar region." (*Id*. at 9.)

Plaintiff filed HNRs on August 9 and 15, 2017, stating that he was in great pain and had received nothing for it since August 6. (*Id*. at 19, 21.)

On August 12, 2017, Plaintiff was taken to the medical unit on a gurney "for possible self inflicting behavior witnessed by LPN Williams and officers." (Doc. 76 at 11 ¶ 23.) Plaintiff reported that he fell, but staff reported that Plaintiff laid himself on the floor and then called to staff stating he had fallen. (*Id*.) "It was then reported that [Plaintiff] got out of the wheelchair and threw himself into the wall and had verbal aggression towards the officer." (*Id*.) Upon examination, Plaintiff was found to be alert and oriented, but he refused a shoulder palpation to assess pain and his gait could not be assessed because he

was on a gurney. (*Id.*) There was bruising on the elbow and knee, but no swelling on the shoulder. (*Id.*) The plan of care was to have Plaintiff "evaluated by a psych." (*Id.*)

On August 17, 2017, Plaintiff had an MRI of his cervical spine. (Doc. 76 at 12 ¶ 24.) Plaintiff also saw NP Gay that day for his complaints of urinary retention. (*Id.*) Plaintiff denied any fever, chills, nausea or vomiting. (*Id.*) Plaintiff self-catheterized to provide a urine sample and the urine dip was negative. (*Id.*) The plan was to continue Flomax 0.4 mg daily and Gay prescribed Terazosin.[8] (*Id.*) Gay was also awaiting old urology records to review. (*Id.*)

On August 21, 2017, Plaintiff saw Dr. Stewart, who prescribed Tramadol 50 mg twice daily for Plaintiff's pain. (Doc. 76 at 117.) Dr. Stewart noted that Plaintiff's MRI results confirmed "thecal sac impingement to a significant degree at two levels C2-C3 and at C5-C6," and his plan was to submit an urgent consultation request for neurosurgery. (*Id.*; *see also* Doc. 79-2 at 23-24.)

On October 5, 2017, Plaintiff saw Dr. Chris Johnson for pain management. (Doc. 76 at 12 ¶ 26.) Plaintiff requested Tramadol 3 times a day, but Johnson expressed concern about Plaintiff, who admitted to a history of drug abuse, escalating his narcotic use; Johnson said he would like try other pharmacologic therapies. (*Id.*) After assessment, Johnson prescribed Oxcarbazepine and discontinued Plaintiff's Tamsulosin due to its dangerous interaction with Oxcarbazepine.[9] (*Id.*; Doc. 76 at 120.)

Plaintiff saw Dr. Johnson again on October 18, 2017 for his complaints of urinary hesitancy since his Tamsulosin was discontinued. (Doc. 76 at 12-13 ¶ 27.) Plaintiff asked

_____

[8] Flomax and Terazosin are both urinary retention medications. (Doc. 76 at 12 nn. 12-13.)

[9] Oxcarbazepine is an anticonvulsant used alone or in combination with other medications to control certain types of seizures and is sometimes used to treat bipolar disorder. U.S. Nat'l Inst. of Health, Medline Plus, *Oxcarbazepine*, *available at* https://medlineplus.gov/druginfo/meds/a601245.html (last visited Feb. 11, 2019). Tamsulosin is used to treat the symptoms of an enlarged prostate. U.S. Nat'l Inst. of Health, Medline Plus, *Tamsulosin*, *available at* https://medlineplus.gov/druginfo/meds/a698012.html (last visited Feb. 11, 2019).

that his Oxcarbazepine be stopped, and Dr. Johnson discontinued the Oxcarbazepine and requested a urology consultation. (*Id*.) Plaintiff was notified on October 26, 2017 that instead of a urology consult he would be given an alternative treatment plan in the form of resuming his previous medication, Dutasteride .5 mg.[10] (Doc. 76 at 125.)

Plaintiff had the neurosurgery consult on November 17, 2017, but because Plaintiff's MRI and "associated documents" were not sent with Plaintiff, the consult could not be completed and had to be re-scheduled. (*Id*. at 13 ¶ 29; Doc. 79-2 at 46 ¶ 27.)

On December 13, 2017, Plaintiff saw Dr. Johnson for his complaints of urinary retention; Dr. Johnson requested a urology consult and renewed various SNOs. (Doc. 76 at 13 ¶ 30.) Plaintiff saw Dr. Johnson again on January 10, 2018 for his complaints of neck pain and dizziness. (*Id*. ¶ 31.) Plaintiff asked that his Tramadol be increased, and Dr. Johnson conferred with Dr. Stewart and both agreed that increasing Tramadol was contraindicated based on Plaintiff's complaints of dizziness. (*Id*.) The plan of care was to obtain an EKG and orthostatic vital testing. (*Id*.) Plaintiff was also informed that the neurologist had his MRI imaging and they were awaiting an appointment and they were searching for a urologist willing to see Plaintiff. (*Id*.) Plaintiff saw Dr. Johnson on February 20, 2018 for his complaints of neck and back pain and insisted that his Tramadol be increased and that he was unwilling to try other medications. (*Id*. ¶ 32.) Plaintiff reported that his dizziness had gone away, and Dr. Johnson increased Plaintiff's Tramadol to 3 times daily because Plaintiff complained that his evening dose did not last until the morning dose was administered. (*Id*.)

On March 12, 2018, Plaintiff had the consultation with neurosurgeon Dr. Feiz-Erfan, who diagnosed Plaintiff with cervical myelopathy (HCC) and recommended anterior cervical fusion surgery at cervical 5-6. (*Id*. at 142-43.) Prior to scheduling surgery,

---

[10] Dutasteride is used to treat benign prostatic hyperplasia (enlargement of the prostate gland). U.S. Nat'l Inst. of Health, Medline Plus, *Dutasteride*, *available at* https://medlineplus.gov/druginfo/meds/a603001.html (last visited Feb. 11, 2019).

Plaintiff needed medical clearance from a primary care provider, a CT of the cervical spine, an EKG, a chest x-ray and lab work. (*Id*.)

On March 13, 2018, Plaintiff saw urologist Dr. Homayoon for complaints of urinary retention. (*Id*. at 14 ¶ 34.) Dr. Homayoon diagnosed Plaintiff with nephrolithiasis (non obstructive bilateral renal stones) and recommended that Plaintiff have follow-up imaging in one year or if they become symptomatic, but that Plaintiff did not need surgical/endoscopic intervention at this time. (*Id*.) The plan of care was to check PSA levels and schedule a urodynamic study for evaluation of the bladder. (*Id*.) Plaintiff's PSA levels were checked on March 25, 2018 and were normal. (*Id*. ¶ 35.) Plaintiff had the urodynamic study on May 21, 2018 and a cystoscopy was recommended. (*Id*. ¶ 37.)

Plaintiff had EKGs on March 29 and August 11, 2018. (*Id*. ¶ 36.) On June 13, 2018, Plaintiff saw Dr. Johnson, who reviewed the urology and neurosurgery consults and performed a pre-op exam, finding that Plaintiff was stable for anterior cervical fusion. (*Id*. ¶ 38.) On August 9, 2018, Dr. Johnson noted that the neurology office said the pre-op evaluation was conducted too soon and Plaintiff's labs, chest x-ray and EKG needed to be repeated prior to scheduling surgery. (*Id*. at 15 ¶ 39.) Plaintiff had chest and lumbar spine x-rays taken August 9, 2018. (*Id*. ¶¶ 40-41.)

Also on August 9, 2018, an alternative treatment plan (ATP) of monitoring Plaintiff was put in place for Plaintiff's neurogenic bladder because the rationale from the urologist for recommending a cystoscopy was not provided. (*Id*. ¶ 42.) Dr. Johnson did not accept the ATP and forwarded it to the Regional Medical Director for review on August 10, 2018 and, after discussion with the Regional Medical Director, the ATP was accepted. (*Id*.) Plaintiff states that he continues to use the "process" and catheters to void. (Doc. 79-2 at 46 ¶ 29.)

On August 28, 2018, Dr. Johnson cleared Plaintiff for neck surgery. (Doc. 76 at 15 ¶ 44.) Plaintiff had the surgery for anterior cervical disc fusion of C5-C6 on December 11, 2018. (Doc. 84 at 5 ¶ 1.) Plaintiff had a neurosurgery follow-up appointment on January 9, 2019, and it was noted that Plaintiff's strength had improved since surgery. (*Id*. ¶ 2.)

The neurosurgeon's office wanted Plaintiff to return in 8 weeks with a cervical spine CT and to begin physical therapy for gait/balance 2 to 3 times a week for 12 weeks. (*Id.* at 41.)

## V. Eighth Amendment

To prevail on an Eighth Amendment medical claim, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to this analysis: an objective prong and a subjective prong. As to the objective prong, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted). Indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60.

As to the subjective prong, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). To satisfy the knowledge component, the official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir.2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. But

the deliberate-indifference doctrine is limited; an inadvertent failure to provide adequate medical care or negligence in diagnosing or treating a medical condition does not support an Eighth Amendment claim. *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citations omitted); *see Estelle*, 429 U.S. at 106 (negligence does not rise to the level of a constitutional violation). Further, a mere difference in medical opinion does not establish deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

Finally, even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

## VI. Discussion

### A. Serious Medical Need

There is no dispute between the Parties that Plaintiff's conditions constitute serious medical needs.

### B. Deliberate Indifference

The Court therefore moves directly to the subjective prong—whether the response to Plaintiff's serious medical needs amounts to deliberate indifference. *See Jett*, 439 F.3d at 1096. The Court must analyze whether each individual Defendant was in a position to take steps to avert the harm but failed to do so intentionally or with deliberate indifference. *See Leer v. Murphy*, 844 F.2d 628, 633-34 (9th Cir. 1988) ("inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused the constitutional deprivation").

### A. Defendant Gay

Defendants argue that Gay "consistently provided treatment to Plaintiff regarding his complaints of pain" and the fact that she provided an alternative non-narcotic medication for his neuropathy and pain does not amount to deliberate indifference. (Doc. 75 at 18, citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) ("A difference of

[medical] opinion does not amount to deliberate indifference to [plaintiff's] serious medical needs.").) Defendants argue that Gay "was similarly responsive to Plaintiff's urinary complaints and symptoms" and, even though Plaintiff was taken to the hospital for a UTI, Gay had appropriately assessed him 11 days earlier because the urine dip came back negative for the presence of bacteria and she ordered a urine culture. (*Id*. at 18-19.) They contend that Plaintiff's allegations that Gay gave him a UTI "are implausible and not supported by the record." (*Id*. at 19.)

The record reflects that on May 17, 2017, Gay reduced Plaintiff's Tramadol from 3 doses totaling 200 mg daily to 2 doses totaling 100 mg daily and added Zonisamide to treat his pain. (Doc. 76 at 33.) Gay states that she decreased Plaintiff's Tramadol because Plaintiff had been on Tramadol, a narcotic, for years, and she wanted to use an alternative treatment plan for his pain management. (*Id*. at 43 ¶ 11.) Gay, though, has not presented any evidence supporting that her alternative treatment plan was medically acceptable given Plaintiff's long-term use of Tramadol for pain or that Zonisamide, an anticonvulsant, was an appropriate substitute. Gay also asserts that she decreased Plaintiff's Tramadol due to new rules concerning long-term narcotic use but, as noted, she does not explain who issued the rules, what the rules said, or how they applied to Plaintiff. Therefore, there is a genuine issue of material fact regarding Gay's reduction in Plaintiff's Tramadol prescription.

There is also a question of fact regarding Gay's treatment of Plaintiff's urinary issues. The parties dispute whether Gay forced Plaintiff to use a dirty catheter on May 19, 2017. More importantly, Plaintiff presents evidence that he submitted an HNR on May 27, 2017 about having to use the same catheter, that his urine was cloudy and smelled horrible, that he had a burning sensation when urinating, and he suspected he had a UTI. RN Ortiz saw Plaintiff that day and referred him to Gay, but Plaintiff did not see Gay that day and Defendants do not explain why Gay did not see Plaintiff for these emergent issues. Plaintiff was found 3 days later covered in urine and vomit and with a fever and was rushed to the emergency room, where he was diagnosed with a UTI. Although Defendants, on May 27, were still awaiting the lab results from Plaintiff's May 19 urine culture, Defendants do not

explain why it was medically acceptable, in light of Plaintiff's emergent symptoms on May 27, that another urine dip or culture was not taken or anything done to address these new symptoms. Therefore, there is a genuine issue of material fact regarding Gay's treatment of Plaintiff's urinary issues.

Because there are disputed issues of material fact as to whether Gay was deliberately indifferent to Plaintiff's serious medical needs, the Court will deny Defendants' and Plaintiff's Motions for Summary Judgment as to Defendant Gay.

## B.  Defendant Barker

Defendants argue that on August 1, 2017, Plaintiff became hostile with Dr. Barker and had to be removed by security and Dr. Barker therefore "had to rely on previous medical records and accounts regarding Plaintiff's mobility by other providers and staff." (Doc. 75 at 20.)  They contend that Dr. Barker "noted other staff reported Plaintiff ambulated well" and this, combined with "Plaintiff's history of malingering and drug-seeking behavior," led Dr. Barker to find "there was no justification for a wheelchair, narcotics or muscle relaxants." (*Id*.)  Defendants argue that "[e]ven if later providers decided to treat Plaintiff in a different manner, this also does not rise to the level of deliberate indifference by Dr. Barker." (*Id*.)  Defendants also cite to Dr. Barker's August 9, 2017 examination "for reassessment for any possible neurological deficit," and he found "no symptoms or physical findings to correlate with" Dr. Stewart's suggested C4 through C6 level abnormality.  (Doc. 76 at 10 ¶ 22.)

Plaintiff disputes Defendants' version of events, asserting that on August 1 he was seated outside the provider's office having his vitals taken when Dr. Barker began verbally abusing him, calling Plaintiff a fake and a liar, and had Plaintiff removed from the health unit without examining him.  (Doc. 79-2 at 45 ¶¶ 19-20.)  The following day, Plaintiff states that he fell while trying to use a walker, and although Dr. Barker ordered x-rays, he also had Plaintiff's wheelchair removed for 2 days and reduced Plaintiff's Robaxin by 67% and Tramadol by 60%.  (*Id*. at 68.)

While it is possible that Dr. Barker's August 9 examination was simply a disagreement with the findings of all other providers in the record, both before and after, this does not justify Dr. Barker's treatment of Plaintiff on August 1 and 2, 2017. The Court has already noted that Dr. Barker does not cite to any medical records showing that Plaintiff ambulated well or that Plaintiff had a history of malingering and drug-seeking behavior, other than Dr. Barker's averments. For example, Dr. Barker refers repeatedly in his medical notes and Declaration to "Dr. Gay's" assessment as showing Plaintiff ambulated well, but medical records from Plaintiff's March 10, May 19, and May 31, 2017 exams by Defendant Gay do not state this and the Court has not located any records by a Dr. Gay. (*See* Doc. 76 at 18-19, 33-34, 61-63, and 88-91 ¶¶ 9, 11, 12.) Consequently, Defendants fail to comply with Federal Rule of Civil Procedure 56(c)(1)(A), which provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by[ ] citing to particular parts of materials in the record." "Materials that are not yet in the record—including materials referred to in an affidavit or declaration—must be placed in the record." Fed. R. Civ. P. 56, advisory comm. note to 2010 amendments. As stated, the Court may consider any materials in the record whether cited to or not; however, the Court is not required to comb through the materials to find medical records supporting Dr. Barker's declaration statements. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001); *see also Indep. Towers of Wash. v. Wash.*, 350 F.3d 925, 929 (9th Cir. 2003) ("[j]udges are not like pigs, hunting for truffles buried in briefs") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). Under Rule 56, the movant must satisfy its initial burden by citing to evidence in the record in support of its factual assertions. Rule 56(c)(1)(a); *Celotex*, 477 U.S. at 323.

Moreover, Dr. Barker's alleged comments about Plaintiff being a "fake" and a "liar" and that Plaintiff was malingering and using his condition to delay his sentence are evidence of personal animosity or hostility to Plaintiff that interfered with the timely treatment of Plaintiff's serious medical needs. A jury could conclude based on facts such as these that Barker was deliberately indifferent to Plaintiff's serious medical needs. *See*

*Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (a delay in treatment based on personal animosity and not honest medical judgment would be medically unacceptable and constitute deliberate indifference); *George v. Sonoma Cnty. Sheriff's Dep't*, 732 F. Supp. 2d 922, 937 (N.D. Cal. 2010) ("[s]uspicions of malingering may [ ] be considered an indication of an ulterior motive whereby a defendant failed to take a plaintiff's condition seriously and thus acted recklessly in failing to provide proper care"). Whether or not Dr. Barker's removal of Plaintiff's wheelchair and discontinuing Plaintiff's medications was based on a good-faith belief that Plaintiff was malingering is an issue for the jury. *See Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002).

Accordingly, there are disputed issues of material fact as to whether Barker was deliberately indifferent to Plaintiff's serious medical needs, and the Court will deny Defendants' and Plaintiff's Motions for Summary Judgment as to Defendant Barker.

## C.    Defendant Johnson

Defendants argue that Johnson is not a medical provider and, as FHA, "appropriately responded to Plaintiff's grievances and provided medical documentation to support her assessment that proper medical care had been provided." (Doc. 75 at 23.) Plaintiff makes no argument in his Response as to Defendant Johnson's liability.

The record reflects that FHA Johnson responded to Plaintiff's May 18, 2017 grievance on May 26, 2017 and determined it was not an emergency because Plaintiff saw the provider the day after he filed the grievance. (Doc. 76 at 4 ¶ 7.) Johnson responded to Plaintiff's June 11, 2017 grievance on June 30, 2017, noting the care that Plaintiff had received from Dr. Williams on June 2, 2017 and stating that she was sending a copy of Plaintiff's grievance to the medical director for review. (*Id.* at 71.) And, on August 4, 2017, Johnson responded to Plaintiff's grievance about the encounter with Dr. Barker on August 1 and said that she had the medical director complete a follow-up assessment that day, that an MRI was requested, and Plaintiff's wheelchair use was permitted. (*Id.* at 100.) Johnson also responded to communications from Plaintiff's wife about Plaintiff's medical care. (*Id.* at 6-7 ¶¶ 13, 15.)

Based on this record, there is no genuine issue of material fact that Johnson was deliberately indifferent to Plaintiff's serious medical needs and the Court will grant summary judgment to Johnson and dismiss Johnson from this action.

### D. Defendant Babich

Defendants argue that Dr. Babich, the Medical Director at ASPC-Eyman, "responded appropriately within the limitations of his position and he acted with no deliberate indifference to Plaintiff." (Doc. 75 at 24.) Plaintiff makes no argument in his Response as to Defendant Babich's liability.

The record reflects that Plaintiff addressed a May 24, 2017 HNR regarding his pain to Dr. Babich, but the response on the HNR says the HNR was sent to the FHA. (Doc. 79-1 at 5.) Babich also received two emails from Plaintiff's wife about Plaintiff's medical care and Defendant Johnson responded to those emails. (Doc. 76 at 6-7 ¶¶ 13, 15.) The only other evidence in the record regarding Dr. Babich is that Plaintiff had an appointment scheduled with Babich on July 13, 2017, but that appointment never took place. (*See* Doc. 79-1 at 42.) There is no explanation for why this appointment never took place, but there is no evidence that Dr. Babich was aware of this appointment or that he canceled it out of deliberate indifference to Plaintiff's serious medical needs.

Based on this record, there is no genuine issue of material fact that Babich was deliberately indifferent to Plaintiff's serious medical needs and the Court will grant summary judgment to Babich and dismiss Babich from this action.

### E. Defendant Corizon

To support a § 1983 claim against a private entity performing a traditional public function, such as providing medical care to prisoners, a plaintiff must allege facts to support that his constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the private entity. *See Tsao v. Desert Palace, Inc*., 698 F.3d 1128, 1138-39 (9th Cir. 2012) (extending the "official policy" requirement for municipal liability under *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 691 (1978), to private entities acting under color of law). Under *Monell*, a plaintiff must show that (1) he suffered a

constitutional injury; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional injury. *See Monell*, 436 U.S. at 691-94; *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

Defendants argue that Plaintiff has failed to present any evidence to support his allegations that Corizon's policies and practices "make it impossible for him to receive timely and adequate care." (Doc. 75 at 26.) They contend that "[t]he voluminous list of Plaintiff's medical encounters reflect the attention to which medical providers have paid to Plaintiff and his various medical concerns." (*Id.*)

Defendants have failed to carry their initial burden on summary judgment showing that there are no disputed issues of material fact. There is evidence in Plaintiff's medical records that two providers (Gay and Barker) reduced or discontinued Plaintiff's pain medication and Barker removed Plaintiff's wheelchair without any medical justification. Nor have Defendants explained why it took a month for Plaintiff to be examined for his complaints of significant numbness and trouble moving his legs. Defendants have also failed to provide sufficient evidence explaining why the urologist's recommendation for a cystoscopy was denied or why, if the specialist's rationale for recommending a cystoscopy was not provided, someone did not seek further information from the specialist. Also, Defendants present no evidence explaining why Plaintiff did not see a urologist until March 13, 2018 when he first started complaining of urinary issues in May 2017 and Dr. Johnson requested urology consults in October and December 2017. Likewise, Defendants have failed to present evidence explaining the delay in Plaintiff seeing the neurosurgeon and having the neck surgery. Plaintiff first saw the neurosurgeon on November 17, 2017, but the consult could not be completed because Plaintiff's records were not sent with him. Plaintiff did not see the neurosurgeon again until March 12, 2018 and at that appointment,

the surgeon recommended surgery.[11]  Although Plaintiff needed various tests before the surgery could be performed, Plaintiff did not have the surgery until December 11, 2018, and Defendants offer no reason or explanation for the delays.  Moreover, Plaintiff has presented evidence that he suffered significant pain and discomfort during the delays.

As such, Corizon has failed to carry its burden of showing that there is no disputed issue of material fact as to whether it has a custom or policy of failing to act in a timely manner on outside consultation requests, specialist recommendations, or in seeing a healthcare provider.  *See Oyenik v. Corizon Health Inc.*, 696 F. App'x 792, 794 (9th Cir. 2017) (a reasonable jury could conclude that at least a dozen instances of defendant Corizon denying or delaying consultations and radiation treatment for cancer patient over a year amounts to a custom or practice of deliberate indifference) (citing *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992)).

In short, Defendants have altogether failed to carry their burden in showing that there are no disputed issues of material fact that Plaintiff was deprived of his Eighth Amendment rights due to the delays in his medical care, that the deprivation was due to Corizon's custom or policy, that the custom or policy amounted to deliberate indifference to Plaintiff's serious medical needs, or that the custom or policy was the moving force behind the delays in Plaintiff's medical care.  Likewise, Defendants have failed to show that these instances of failing to act on consultation requests, specialist recommendations, and delays in seeing a provider were isolated.  Because there are disputed issues of material fact, the Court will deny summary judgment to Corizon.

### F.    Punitive Damages

Defendants' Motion is also denied to the extent it seeks dismissal of Plaintiff's claim for relief of punitive damages.  Punitive damages are available under § 1983 and may be awarded, in the jury's discretion, "when a defendant's conduct was driven by evil motive

---

[11] The Court notes that Plaintiff did not see the urologist or have the second neurosurgery consult until after the Court issued an Order on February 6, 2018 for Defendants to show cause why Plaintiff's injunctive relief requests for neurosurgery and urology consultations should not be granted.  (*See* Docs. 24, 29.)

or intent, or when it involved a reckless or callous indifference to the constitutional rights of others." *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005); *see Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 17 (1991); *Smith v. Wade*, 461 U.S. 30, 48, 54, 56 (1983) ("punitive damages are awarded in the jury's discretion").

Defendants argue that Plaintiff is not entitled to punitive damages because he cannot show that Defendants' conduct was driven by evil motive or intent or that its conduct was reckless or callously indifferent to Plaintiff's constitutional rights. But the Court has determined genuine issues of material fact exist as to the exact nature of certain Defendants' conduct. On this record, a jury could conclude that those Defendants acted with callous or reckless indifference to Plaintiff's constitutional rights, and, as a result, may assess punitive damages. Thus, Defendant's Motion for Summary Judgment will be denied as to punitive damages.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Plaintiff's Motion for Partial Summary Judgment Against Defendants Gay and Barker (Doc. 44); Defendants' Motion for Summary Judgment (Doc. 75); and Plaintiff's Objection to and Motion to Strike Defendants' Summary Judgment Reply (Doc. 85).

(2) Plaintiff's Objection to and Motion to Strike Defendants' Summary Judgment Reply (Doc. 85) is **denied**.

(3) Plaintiff's Motion for Partial Summary Judgment against Defendants Gay and Barker (Doc. 44) is **denied**.

(4) Defendants' Motion for Summary Judgment (Doc. 75) is **granted in part and denied in part** as follows:

(a) The Motion is **granted** as to Defendants Johnson and Babich and Johnson and Babich are **dismissed from this action with prejudice**.

(b) The Motion is **denied** as to Defendants Gay, Barker and Corizon.

(5) The remaining claims are Plaintiff's Eighth Amendment medical care claims against Defendants Gay, Barker and Corizon.

1    (6)    This action is referred to Magistrate Judge Michelle H. Burns to conduct a
2    settlement conference.
3    (7)    Defense counsel shall arrange for the relevant parties to jointly call
4    Magistrate Judge Burns' chambers at (602) 322-7610 within 14 days to schedule a date for
5    the settlement conference.
6    Dated this 21st day of February, 2019.

James A. Teilborg
Senior United States District Judge